KUHN, J.
 

 Defendant-appellant, Al Copeland Investments, Inc. (ACI), appeals the trial court’s judgment certifying a class in this suit filed by plaintiff-appellee, Debra Maddox doing business as Party Paradise (Party Paradise), based on allegations of violations of the Telephone Consumer Protection Act. Finding plaintiff failed to objectively define the class, we reverse.
 

 
 *1020
 
 FACTUAL AND PROCEDURAL BACKGROUND
 

 On September 24, 2004, Party Paradise filed a petition against ACI on its own behalf and for certification as the representative of a class consisting of all recipients of unsolicited telefacsimile (fax) messages and/or advertisements within the states of Louisiana and Mississippi, which were transmitted and/or initiated by or on behalf of ACI between the dates of September 24, 2000, through the present, in violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C.A. § 227
 
 et seq.
 
 Expressly excepted from the alleged class were “any recipients from whom [ACI] has received the prior express invitation or permission to receive [fax] advertisements.”
 

 Party Paradise moved to have the class certified and also filed a motion for sanctions for willful spoliation of evidence, seeking to have an adverse evidentiary presumption imposed. ACI filed various exceptions. After a hearing on September 10, 2007, the trial court issued “FINDINGS OF FACT AND CONCLUSIONS OF LAW,” in which it designated “Display South” as the class representative and stated that the class consisted of:
 

 [a]ll recipients of unsolicited [fax] messages and/or advertisements within the states of Louisiana and Mississippi which were transmitted and/or initiated by or on behalf of [ACI] between the dates of September 1, 2002 and April 1, 2004, excluding any recipients from |swhom [ACI] received prior express invitation or permission to receive [fax] advertisements.
 

 A hearing on ACI’s exceptions was subsequently held on January 14, 2008. The trial court issued an order on May 30, 2008, sustaining in part and overruling in part ACI’s objections of improper cumulation of claims and improper joinder. The trial court’s order stated:
 

 With regard to plaintiffs claim to certify an action which joins claims for receipt of faxes sent in 2002 and 2004, the exceptions are granted. With regard to plaintiffs claim to certify an action which joins claims for receipt of faxes sent to both Louisiana and Mississippi residents, the exceptions are denied. Plaintiff is entitled to seek certification of a class comprised only of recipients of faxes in 2004 that are residents of Louisiana and Mississippi^]
 

 On that same day, the trial court issued “AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW,”
 
 [1]
 
 which narrowed the class in conformity with the May 30, 2008 order and designated Debra Maddox on behalf of Party Paradise as the class representative. A judgment was signed on June 3, 2008, which designated the class as:
 

 [a]ll recipients of unsolicited [fax] messages and/or advertisements within the states of Louisiana and Mississippi which were transmitted by and/or initi
 
 *1021
 
 ated by or on behalf of [ACI] between the dates of January 1, 2004 and April 1, 2004, for claims under the TCPA.
 

 ACI timely appealed.
 

 14APPLICABLE LAW
 

 The TCPA makes it a violation of federal law to use any telephone facsimile machine, computer, or other device to send an “unsolicited advertisement” to a telephone facsimile machine.
 
 See
 
 47 U.S.C.A. § 227(b)(1)(C). An “unsolicited advertisement” is defined as “any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person’s prior express invitation or permission, in writing or otherwise.” 47 U.S.C.A. § 227(a)(5). Private citizens whose rights under the TCPA have been violated may sue to enjoin future transmissions, recover the greater of actual monetary damages or $500 in damages for each such fax, or obtain injunctive relief plus damages.
 
 See
 
 47 U.S.C.A. § 227(b)(3). For willful or knowing violations of the TCPA, the court has discretion to increase the amount of the award to not more than three times the amount of damages specified above.
 
 See
 
 47 U.S.C.A. § 227(b)(3);
 
 Display South, Inc. v. Graphics House Sports Promotions, Inc.,
 
 2007-0925 (La.App. 1st Cir.6/6/08), 992 So.2d 510, 515,
 
 writ not considered,
 
 2008-1562 (La.10/10/08), 993 So.2d 1274.
 

 The class action is a nontraditional litigation procedure permitting a representative with typical claims to sue, on behalf of a class of similarly situated persons, when the question is of common or general interest to persons so numerous as to make it impractical to bring them all before the court. The purpose of the procedure is to adjudicate and obtain res judi-cata effect on all common issues applicable not only to the representatives who bring the action, but to all others who are similarly situated, provided they are given adequate notice of the pending class action and do not timely exercise the option of exclusion from the class.
 
 Id.; Ford v. Murphy Oil U.S.A., Inc.,
 
 96-2913 (La.9/9/97), 703 So.2d 542, 544.
 

 Class actions in Louisiana are governed by La. C.C.P. arts. 591-597. Article 591 states in relevant part:
 

 A. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
 

 (1) The class is so numerous that join-der of all members is impracticable.
 

 (2) There are questions of law or fact common to the class.
 

 (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
 

 (4) The representative parties will fairly and adequately protect the interests of the class.
 

 (5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
 

 B. An action may be maintained as a class action only if all of the prerequisites of Paragraph A of this Article are satisfied....
 

 The only issue to be considered by the trial court in ruling on certification, and by this court on review, is whether the case at bar is one in which the procedural device of a class action is appropriate. In determining the propriety of a class action, the court is not concerned with whether the plaintiff has stated a cause of action or the likelihood that it ultimately will prevail on the merits. A trial court’s decision to certify a class is a two-step process. Therefore, appellate review of such deci
 
 *1022
 
 sions also follows a two-step analysis. The trial court must first determine whether a factual basis exists for certifying the matter as a class action. These factual findings are reviewed on appeal pursuant to the manifest error | (¡standard of review. If the trial court finds that a factual basis exists for certifying the action, it then exercises its discretion in deciding whether to certify the class. This aspect of the judgment is reviewed pursuant to the abuse of discretion standard. Unless a trial court committed manifest error in its factual findings or abused its discretion in deciding that class certification is appropriate, we must affirm the trial court’s determination.
 
 Display South, Inc.,
 
 992 So.2d at 516.
 

 DISCUSSION
 

 On appeal, ACI challenges the trial court’s conclusion that plaintiff satisfied the prerequisites set forth in La. C.C.P. art. 591 A(5). On this element of class certification, the trial court’s May 30, 2008 factual findings state:
 

 This class may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case. Specifically, any recipients of any faxed advertisements transmitted by or on behalf of [ACI] between the dates of January 1, 2004 and April 1, 2004 is an objectively definable class of persons which satisfies the requirement of La. C.C.P. art. 591(A)(5).
 

 Further, the identity of the class members is readily ascertainable through the [re-creation] of the lists of intended recipients. While [ACI] argues that this [re-creation] process does not adequately identify the putative class members, the Court is convinced, based on the evidence presented at the hearing, that [Party Paradise has] identified an accurate methodology by which the proposed class can be objectively defined. The [re-created] data lists, which identify each class member by name, address, phone number and fax number, adequately identify the putative class members, and the methodology utilized to generate these lists is an acceptable method for doing so.
 

 ACI maintains that the trial court was manifestly erroneous in concluding that the methodology used by Party Paradise to identify the recipients of the faxes sent in 2004 was a method that objectively identified the putative class.
 

 |
 
 determination Based on Evidence Admitted at the Hearing
 

 The evidence admitted at the hearing to certify the class included the deposition testimony of Charlotte Womac,
 
 [2]
 
 a corporate representative for ACI, who worked in the marketing department in 2004 as a field local marketing coordinator. She testified that the idea of utilizing faxes as a way to advertise was hers. After presenting the idea to her supervisor, Linda Carver Poiner, Womac was authorized to pursue the idea. Womac was ACI’s sole representative in the fax campaign. Through a website, cheapfaxes.com, Wo-mac eventually contacted Protus IP Solutions, Inc. (“Protus”). Her primary contact at Protus was Peter Komoto. With Protus, she discussed a campaign of faxing advertisements in conjunction with a Mar-di Gras Madness promotion ACI was undertaking, specifically targeting businesses within certain zip codes and different mile radii around ACI restaurants. Womac’s goal was to have advertisements faxed to
 
 *1023
 
 any business that had a fax machine located within specified parameters around the Essen Lane restaurant in Baton Rouge. She identified an email she received from Komoto, dated March 16, 2004, which indicated “counts” of “5 mi = 3997” and “10 mi = 6315” for “Essen Lane” and “5 mi = 1802” and “10 mi = 4281” for “Ridge-wood Rd.” Womac explained that Ridge-wood Road was the location of an ACI restaurant in Mississippi and stated that she was uncertain whether a fax campaign had been undertaken for that restaurant. Wo-mac admitted that she was most likely the person who had drawn circles around the geographic indicators of “5 mi = 3997” for Essen Lane and “10 mi = 4281” for Ridgewood | sRoad on the hard copy of the email but did not explain what the encircling represented. Based on the email, Womac believed that ACI had probably engaged in a five-mile fax campaign in connection with the Essen Lane location.
 

 Womac thought that she had not directed Protus to specific businesses to which advertisements should be faxed, recalling it was an essentially blind advertisement campaign. She testified that ACI had hired Protus to send one-page faxes, which specified ACI goods and services that were available to the recipient, and identified a single-page advertisement that had been created by an outsource company for ACI. Womac explained that the success of transmissions was relayed to her by email, with Protus advising her of the number of intended recipients as well as the number of actual recipients. ACI was billed only for the number of actual recipients. The email correspondence between Womac and Komoto would have been on a computer Womac used when she worked in ACI’s marketing department. Protus invoiced ACI for $143.00 on February 29, 2004; and $824.80 on March 31, 2004. Womac stated that she had no knowledge of the prohibitions contained in the TCPA at the time of the fax campaigns, and it was her impression that no one at ACI did either.
 

 Introduced into evidence was the affidavit of Thomas Martin, the chief financial officer for and authorized representative of Protus. He stated that ACI engaged Pro-tus to send faxes to numbers provided by a third party provider. In February and March of 2004, according to Martin, 9,768 faxes were successfully transmitted over Protus’ network on behalf of ACI. ACI paid $143.00 for the fax ^transmissions and had an outstanding balance of $824.80 on the account.
 
 [3]
 
 Martin stated:
 

 At the time of the transmissions ... it was Protus’ established protocol and procedure not to be involved in the determination of recipient fax numbers to whom Protus’ customers sent faxes. Rather, Protus’ customers either provided the recipient fax numbers to Protus directly or acquired recipient fax numbers from third party list providers.
 

 In his affidavit, Martin neither explained whether ACI had provided the recipient fax numbers directly to Protus nor identified a third party list provider who may have. The record contains no other testimonial evidence from Protus representatives.
 

 In responses to interrogatories, ACI admitted that Womac had been advised by Komoto that faxes “totaling 3997 pages had been transmitted within a five-mile radius of the Restaurant” and faxes “totaling 6,315 pages had been transmitted within a ten-mile radius of the Restaurant.” It also admitted that Protus had sent invoices
 
 *1024
 
 to ACI for 8,249 fax transmissions, which ACI had not paid. ACI stated that it did not have any information regarding the persons who may have received faxes transmitted by Protus or how Protus obtained the fax numbers for which Protus invoiced ACI. Additional responses to interrogatories include admissions by ACI that it engaged Protus to send faxes in March 2004 and that the request may have included businesses located in Baton Rouge who might patronize the Essen Lane restaurant; and businesses located in Jackson, Mississippi who might patronize the Ridgewood Road restaurant.
 

 The deposition testimony of Brent Wad-man, corporate counsel for infoUSA, Inc. (infoUSA), who was designated as the company’s representative, was also | ^introduced into evidence at the class certification hearing. Wadman explained that infoUSA licenses its customers to use lists supplied from its database, which contain information gathered on businesses throughout the world. Generally and for purposes of this litigation, Wadman described how a customer provides selection criteria, and infoUSA supplies lists of businesses based on that criteria. He stated that the two other big suppliers of lists of the sort infoUSA creates are Dunn & Bradstreet and Axiom. According to Wadman, infoUSA lists were usually of a higher quality while the other two list providers usually had more businesses included in their lists.
 

 Although Wadman was aware of a prior business relationship with Protus, his search of infoUSA’s records revealed no information identifying fax numbers it may have supplied to Protus to use in any fax campaign for ACI. A historical search for invoices for transactions with ACI, or with the Protus customer identification number assigned to ACI, revealed none. Wadman had no personal knowledge of any relationship between infoUSA and Protus before 2005. According to Wadman, any records of a relationship between infoUSA and Protus before 2005 would have been destroyed in accordance with company procedure, although he found records indicating that Protus was invoiced for the first time in 2000.
 
 [4]
 

 Wadman testified that it was possible that Protus had obtained the fax numbers it used in an early-2004 fax campaign on behalf of ACI from any source. He explained that other list provider companies may have provided different |nbusinesses (counts) in the respective lists in response to selection criteria based on geography, particularly when the customer further narrowed its selection criteria to fax numbers, noting that each company may have different methods of compiling their respective databases. Wadman testified that infoUSA does not guarantee either the accuracy or the legal compliance of any information it provides on a list.
 

 Based on this evidence, Party Paradise cannot establish the actual identity of the putative class.
 
 Compare Display South, Inc.,
 
 992 So.2d at 520 (the record included a print out showing the fax numbers of the 461 recipients of defendant’s faxes as well as testimony that the identity of the recipients could be ascertained and verified) and
 
 Display South, Inc. v. Express Computer Supply, Inc.,
 
 06-1137 (La.App. 1st Cir.5/4/07), 961 So.2d 451, 457 (the testimony established defendant possessed a database of customers and prospective customers that indicated faxes were sent to over 700 potential class members).
 

 
 *1025
 
 Nevertheless, Party Paradise contends that a class should be certified suggesting that it proved a reasonable methodology for ascertaining the putative class.
 
 [5]
 
 Thus, it asserts, the trial court’s conclusion that an objectively defined class exists is supported by the evidence and, therefore, not manifestly erroneous.
 

 Relying on the Protus invoices and the affidavit of Martin, Party Paradise claims it established that 9,768 faxes were successfully transmitted. Next, Party 112Paradise maintains that the circled numbers on the email from Komoto to Womae establish the scope of the putative class, i.e., 3,997 faxes within a five-mile radius of the Essen Lane restaurant and 4,281 faxes within a ten-mile radius of the Ridgewood Road restaurant. We note two problems with this assumption: first, the record contains no evidence supporting a finding that the circled numbers on the email corresponded to the number of faxes successfully transmitted; and second, the sum of 3,997 and 4,281 is 8,278, which does not correspond to the invoiced transmissions or Martin’s affidavit stating that 9,768 had been successfully transmitted.
 

 The next step in the methodology Party Paradise outlined was to utilize the geographic selection criteria (i.e., five-mile radius from the Essen Lane restaurant and ten-mile radius from the Ridgewood Road restaurant) and request of infoUSA a list of businesses and their fax numbers. Attached to Wadman’s deposition were lists of businesses, and their fax numbers, within the five and ten-mile radii of the two restaurants. Although Wadman could not authenticate the printed hard copies of the lists, he believed they corresponded to the lists that infoUSA had electronically produced for Party Paradise in conjunction with this litigation. Admitted into evidence was a letter dated August 28, 2006, from Party Paradise to ACI written after Wadman’s deposition stating:
 

 The purpose of the [Wadman] deposition was to discuss the database search performed by [infoUSA] at our request. Specifically, prior to that deposition, we asked [infoUSA] to perform a search of its archive databases for all businesses with fax numbers within certain geographical radii from different ... addresses. It was represented to us, and subsequently to you at the deposition, that the lists provided by [infoUSA], and ultimately produced to you, represented the information as it existed in ... 2004 from their archive databases.
 

 | UiAfter we returned ... a senior account executive ... of [infoUSA] ... advised that the previous search performed by [infoUSA], and paid by us, did not accurately reflect what we sought to obtain. Specifically, she advised that the [infoUSA] representative we dealt with did not perform a search of the archive information. Instead, he retrieved current information. Accordingly, the lists produced by [infoUSA] to you represent the same search parameters as described above, but includes only current information.
 

 ... We have endeavored to obtain accurate relevant information from [in-foUSA]. During our discussions with [the senior account executive], she ad
 
 *1026
 
 vised that not only was the search conducted of current information, but in ... 2004 [infoUSA] could not perform searches based on the search parameters we provided. Specifically, she said that they could not, at that time, perform searches based on geographical radii. In other words, they could not determine which businesses had fax numbers within a five or ten mile radius of each address.
 

 However, [infoUSA] advised us that they could perform a search of all businesses with fax numbers with zip codes that touched within a certain geographical radii from each address. In other words, they can perform a search of all their archived databases to provide a list of all businesses with fax numbers with zip codes that are within a five or ten mile radius of each address. This search result will produce a list of businesses with fax numbers that is over inclusive, because the search will produce a list of all businesses with the same zip codes, as long as part of the zip code falls within the specified radius. We have requested that [infoUSA] perform this updated search....
 

 Our next step is to perform a geocod-ing of all of the addresses provided in response to the [infoUSA] search to verify that they are within a certain radius of each address. At that point, we will have effectively generated a list of all businesses with fax numbers within a five or ten mile radius of each address, as that information existed in ... 2004.
 

 At the class certification hearing, the trial court admitted lists of businesses ostensibly produced in accordance with the methodology outlined above.
 

 In addition to the previously noted factual deficiencies, we find additional deficiencies in the proposed methodology for determining the putative class. Nothing in the record establishes that infoUSA was the third-party provider of fax 114numbers utilized by Protus in its early 2004 fax campaign undertaken on behalf of ACI. Wadman’s deposition testimony clearly established that no records existed to support a finding that infoUSA supplied any lists of businesses to Protus in 2004, more particularly a list that was utilized by Pro-tus on behalf of ACI. Wadman also testified that the lists generated by one list provider did not conform to the lists generated by another, especially when the collection of fax numbers was based on a selection criterion. Moreover, the letter itself and the reassessment of the basis of collection of the list data set forth in the letter demonstrate the unreliability of Party Paradise’s methodology. We conclude the trial court’s finding that the methodology utilized by Party Paradise was an acceptable method for identifying the potential putative class is manifestly erroneous. Not only did Party Paradise fail to prove the basis for a selection criteria to support a finding that 3,997 faxes had been sent by ACI in 2004 within a five-mile radius of the Essen Lane restaurant and 4,281 within a ten-mile radius of the Ridge-wood Road restaurant, it also failed to establish that the database it proposed to use to identify the recipients was the same database Protus utilized to send the transmission. Thus, the record lacks a factual basis to apply the methodology proposed by Party Paradise.
 
 [6]
 

 Adverse Presumption Based on Spoliation of Evidence
 

 Party Paradise asserted before the trial court that it was entitled to an
 
 *1027
 
 adverse presumption based on spoliation of evidence. At Womac’s deposition, she testified that her correspondence with Protus usually occurred by email, generally between her and Komoto. She indicated that “possibly” there were 115internal emails that would have included Poirier. At Womac’s deposition, which occurred on July 27, 2005, Party Paradise requested an opportunity to inspect the computers that Womac and Poirier were using at the time of the fax campaigns. On August 15, 2005, Party Paradise followed up its verbal request with a letter seeking an inspection of the computers.
 

 On November 22, 2006, Party Paradise filed a motion for sanctions based on spoliation of evidence, seeking an adverse evi-dentiary presumption. In granting relief, the trial court ordered an adverse presumption that “the hard drive did contain evidence that was detrimental to defendant’s case.” On appeal, Party Paradise urges that the adverse presumption establishes that Poirier’s computer contained the fax numbers corresponding to each intended fax recipient of advertisements faxed by Protus on behalf of ACI. Thus, Party Paradise claims that it has satisfied the element of objectively defining the class.
 

 Initially, we question whether Party Paradise can assert a spoliation claim on behalf of the class. Since Party Paradise is a known fax recipient whose fax number has been identified, it is not similarly situated with those unknown recipients it seeks to identify with the evidence that could have been contained on Poirier’s hard drive.
 
 See
 
 La. C.C.P. art. 591 A(3).
 

 Moreover, under an intentional or negligence theory of spoliation, the presumption does not apply if the failure to produce the record is adequately explained.
 
 See Wilhite v. Thompson,
 
 42,395 (La.App.2d Cir.8/15/07), 962 So.2d 493, 498,
 
 writ denied,
 
 2007-2025 (La.2/15/08), 976 So.2d 175;
 
 see also Randolph v. General Motors Corp.,
 
 93-1983 (La.App. 1st Cir.11/10/94), 646 So.2d 1019, 1026,
 
 writ denied,
 
 95-0194 (La.3/17/95), 651 So.2d 276. To employ the presumption otherwise would be to treat the failure to produce evidence under the terms of strict liability, such that the mere failure to produce evidence, regardless of the reason, would trigger the adverse presumption. This is not the standard.
 
 Wilhite,
 
 962 So.2d at 498.
 

 The testimony of ACI’s senior director of information in charge of the IT department, Cynthia Dimitry, was adduced at the hearing on the motion. She stated that Womac’s computer was inspected by Party Paradise and she was involved in the process of the inspection. Dimitry testified that shortly after ACI relocated to temporary facilities on the Northshore after Hurricane Katrina had flooded the lower floor of ACI’s Metairie office, Poirier’s hard drive had crashed. She did not know why the hard drive failed. The marketing department computers, including Poirier’s, which had been located on the second floor of the ACI Metairie building, were the only electronic equipment that survived the storm. Dimitry explained that after the storm, the IT department had to reestablish the ACI network, which included the retrieval of fifteen servers from the Metairie office, the purchase of new computers for nearly every user at ACI, the reinstallation of software, the setting up of electronics at temporary offices on the Northshore, the enhancement of phone systems, and “pretty much reestablishing everything.”
 

 She conceded that tending to Poirier’s crashed hard drive was not an important concern in the scheme of things. After unsuccessfully attempting to recover data through a software recovery program,
 
 *1028
 
 Dimitry said she threw the hard drive out “pretty quickly” after it crashed, well before March 2006. According to Dimitry, 117all Poirier’s documents, except her emails, had been saved in a back-up system to one of the servers. Only emails that had been sent within 30 days prior to the crashing of the hard drive or that Poirier had saved to a folder were recoverable and available for inspection. Dimitry explained that even before the storm, the ACI server only saved emails for 30 days and that any emails of an individual user that existed after the lapse of that time would have been as a result of the user having moved the email to a folder. She said that emails transferred to a folder in that manner would remain on the hard drive of a computer.
 

 Poirier testified at the hearing as well. She stated that she did not recall having any direct communication with Protus or having received any emails or faxes from Womac regarding the fax campaign. According to Poirier, ACI never had any lists of potential customers with their fax numbers so none would have been there were not any on her computer before the hard drive crashed. Poirier remembered that prior to Hurricane Katrina she was made aware that there was a request to examine her computer made in conjunction with this litigation and had been advised to preserve it. She was asked to go through her files, and she did so, providing any information she found on the fax campaign to ACI’s staff attorney. She continued using the computer, and it was available for inspection while she used it. In conformity with Dimitry’s testimony, Poirier said that soon after a temporary office had been set up for her in Abita Springs, which she recalled was in late September, her hard drive crashed. After providing her with a new computer, the IT department took the crashed computer and she had not seen it since. In light of all the upheaval due to the impact of Hurricane Katrina, Poirier |1BbIuntly admitted that when the IT departmental took her computer, the request to preserve her computer “did not cross my mind at all.”
 

 Thus, the evidence provides a reasonable explanation for ACI’s failure to produce the crushed hard drive. About a month after Womac’s deposition, which was the first notice ACI had of Party Paradise’s intent to examine Poirier’s computer, Hurricane Katrina left ACI’s offices in disarray. That Poirier may have overlooked an order to preserve the crashed hard drive is understandable. Importantly, the testimony established that any evidence Poirier’s hard drive may have contained about the relationship between Womac and Protus would have been communications initiated on Womac’s computer, which was produced and made available for Party Paradise’s inspection. Although a trial court is granted broad discretion on evidentiary rulings,
 
 see Everhardt v. Louisiana Dep’t of Transp. and Dev.,
 
 2007-0981 (La.App. 4th Cir.2/20/08), 978 So.2d 1036, 1045, because a reasonable explanation has been provided for ACI’s failure to produce the crashed hard drive, the trial court abused its discretion in ordering an adverse presumption.
 

 DECREE
 

 The trial court’s conclusion that Party Paradise established an objectively defined class based on the evidence is manifestly erroneous; and any adverse presumption it may have given Party Paradise in finding that the class had been objectively defined was an abuse of discretion. Since we have found a factual basis does not exist for certification, the trial court legally erred in its certification. Therefore, its judgment certifying the class is reversed.
 
 *1029
 
 Appeal costs are assessed against Debra Maddox doing business as Party Paradise.
 

 REVERSED.
 

 [1]
 

 . The May 30, 2008 order directed Party Paradise “be given fifteen (15) days from the date of this Judgment to submit Amended Findings of Fact and Conclusions of Law which [clarify] that the claims asserted by the class are limited to claims under the TCPA and [exclude] from the certification order and definition any claim for the receipt of fax advertisements prior to January 1, 2004.” Although the parties do not complain, we note that the practice of one party preparing the reasons for a trial court's judgment has been questioned on previous occasions.
 
 See Bell v. Ayio,
 
 97-0534, p. 3 (La.App. 1st Cir.11/13/98), 731 So.2d 893, 896;
 
 accord City of Plaquemine v. North American Constructors, Inc.,
 
 2000-2810, p. 3 (La.App. 1st Cir.11/8/02), 832 So.2d 447, 450-55.
 
 But compare Hall v. Folger Coffee Co.,
 
 2003-1734, p. 3 n. 4 (La.4/14/04), 874 So.2d 90, 95 n. 9;
 
 see also Miller v. Smith,
 
 402 So.2d 688 (La.1981) (Lemmon.J., dissenting).
 

 [2]
 

 . At times, this witness is identified as "Charlie” and "Charli” Womac.
 

 [3]
 

 . Documents evidencing these representations by Martin were also admitted into evidence.
 

 [4]
 

 . Wadman further explained that infoUSA would have kept records for which a customer requested a list, but it would not retain a historical recording of the selection criteria used to generate a given list.
 

 [5]
 

 .
 
 See CE Design v. Beaty Const., Inc.,
 
 2009 WL 192481 (N.D.Ill.2009) (in which an Illinois federal district court rejected the notion that a master list of potential plaintiffs is necessary for class certification: "A class is identifiable if its members can be ascertained by reference to objective criteria. It is not fatal for class definition to require some inquiry into individual records, as long as the inquiry is not so daunting as to make the class definition insufficient.” citing another federal district court's decision in
 
 Sadowski
 
 v.
 
 Med1 Online LLC,
 
 2008 WL 2224892 (N.D.Ill.2008)).
 

 [6]
 

 . We find noteworthy that in the year between the time of Party Paradise's letter and the hearing on the certification motion, plaintiff did not join one other person as a party to this lawsuit.